**VAN DYKE v. MID–SOUTH COTTON GROWERS ASS'N.**

No. 4243.

District Court, W. D. Tennessee, Western Division.

March 30, 1934.

R. E. Jeffery, of Newport, Ark., for plaintiff.

Abe D. Waldauer and Wm. C. Bateman, both of Memphis, Tenn., for defendant.

ANDERSON, District Judge.

P. H. Van Dyke sues Mid-South Cotton Growers Association for the return of $55,000, on behalf of himself and other growers similarly situated.

The record shows that Mid-South Cotton Growers Association is a nonstock, nonprofit, co-operative association; that it succeeded to the Arkansas, the Tennessee, and Missouri cotton growers' associations; and took over certain liabilities of these associations.

Plaintiff delivered 55 bales of cotton in the crop year of 1930–31 to the association. This cotton was to be carried until July, 1933, by the association. He was paid approximately 90 per cent. of the value of the cotton he delivered. If profit resulted from the holding operation, he was to get it.

In July, 1933, the market had declined. Congress passed the Agricultural Adjustment Act, providing, among other things, that this cotton was to be purchased by the Secretary of Agriculture (7 USCA § 603).

Defendant has been paid $55,000. Plaintiff claims this sum should be disbursed to growers, that the Agricultural Adjustment Act contemplates this being done, and that the defendant has no right to make a deduction for reserves.

█ Jurisdiction is vested in this court over the controversy by section 24 of the Judicial Code. 28 USCA § 41. King County v. Seattle School District No. 1, 263 U. S. 361, 44 S. Ct. 127, 68 L. Ed. 339.

█ Plaintiff's contract with the defendant provides for the deduction of a reserve. There is no question under the law that Mid-South Cotton Growers Association had a right to retain a reserve. Chapter 100, Public Acts of Tennessee for 1923, § 18; Thompson on Corporations (3d Ed.) vol. 8, § 6776; Hanna on Law of Cooperative Marketing Associations, p. 273, and cases there cited.

In fact, reserves were and are essential to the continued existence and operation of nonstock, nonprofit co-operative associations. There is nothing in this record to show that the reserve in this case was unreasonable. The record does show that the contract between Van Dyke and the defendant provides for retention of reserves. It also appears from the record that these reserves have been pledged to the Farm Credit Administration (formerly Federal Farm Board) for debts due by the Mid-South Association to the United States Government.

The court specifically finds that, under the co-operative marketing statute, and express terms of the contract between plaintiff and defendant, the Mid-South Cotton Growers Association has the legal right to make deduction for a reserve.

█ The court further finds that there is nothing in the Agricultural Adjustment Act which interferes with the right of a co-operative association to make a deduction for reserves. The pertinent provisions of that act are as follows:

"Sec. 3. The Federal Farm Board and all departments and other agencies of the Government, not including the Federal intermediate credit banks, are hereby directed—

. "(a) To sell to the Secretary of Agriculture at such price as may be agreed upon, not in excess of the market price, all cotton now owned by them.

"(b) To take such action and to make such settlements as are necessary in order to acquire full legal title to all cotton on which money has been loaned or advanced by any department, or agency of the United States, including futures contracts for cotton or which is held as collateral for loans or advances and to make final settlement or such loans and advances as follows:

140

"(1) In making such settlements with regard to cotton, including operations to which such cotton is related, such cotton shall be taken over by all such departments or agencies other than the Secretary of Agriculture at a price or sum equal to the amounts directly or indirectly loaned or advanced thereon and outstanding, including loans by the Government department or agency and any loans senior thereto, plus any sums required to adjust advances to growers to 90 per centum of the value of their cotton at the date of its delivery in the first instance as collateral to the department or agency involved, such sums to be computed by subtracting the total amount already advanced to growers on account of pools of which such cotton was a part, from 90 per centum of the value of the cotton to be taken over as of the time of such delivery as collateral, plus unpaid accrued carrying charges and operating costs on such cotton, less, however, any existing assets of the borrower derived from net income, earnings, or profits arising from such cotton, and from operations to which such cotton is related; all as determined by the department or agency making the settlement.

"(2) The Secretary of Agriculture shall make settlements with respect to cotton held as collateral for loans or advances made by him on such terms as in his judgment may be deemed advisable, and to carry out the provisions of this section, is authorized to indemnify or furnish bonds to warehousemen for lost warehouse receipts and to pay the premiums on such bonds.

"When full legal title to the cotton referred to in (b) has been acquired, it shall be sold to the Secretary of Agriculture for the purposes of this section, in the same manner as provided in (a).

"(c) The Secretary of Agriculture is hereby authorized to purchase the cotton specified in paragraphs (a) and (b)." 7 USCA § 603.

I think that under the verbiage of that act, the transaction was between the Farm Credit Administration and the co-operative associations; and that it in nowise alters or interferes with the relations between members of the co-operative association and the association. Those relationships are governed by the terms of the marketing contract between the individual members of the association and the defendant.

The above-quoted provisions of the Agricultural Adjustment Act merely prescribe a formula for determining the price to be paid for cotton taken over pursuant to the act, and does not compel payment of sums appropriated thereby directly to the growers. Of course, payment to the co-operative association is required, but thereafter, the relationship between the co-operative association and its members is determined by the marketing contract.

If reserves or deductions were unreasonable, this court, under the peculiar nature and circumstances of the case could probably interfere; but there is nothing in this case to show anything except fair dealing between the association and the members whose cotton is handled.

The court does not believe that the last-mentioned act in any way interferes with the relationship between the association and the members. Nor is there anything in the Agricultural Adjustment Act, above quoted, which prevents payment of the sum appropriated by the association to the obligations due by it to the United States of America.

Finding no merit in the suit of plaintiff, the motion to strike the declaration is sustained, and the suit dismissed.

An order may be entered in accordance with this opinion.